Patricia MAYO, Appellant,

v.

Marshall MOORE, Director, Department of Transportation, Appellee.

Civ. No. 940250.

Supreme Court of North Dakota.

Feb. 8, 1995.

**258**

Bruce D. Quick (argued), Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, for appellant.

Gregory B. Gullickson (argued), Sp. Asst. Atty. Gen., Fargo, for appellee.

MESCHKE, Justice.

Patricia Mayo appeals from a judgment affirming an administrative decision to revoke her driving privileges for one year for refusing tests of her blood-alcohol content. We affirm.

In the early morning hours of March 4, 1994, Ronald Stanley, a trooper with the North Dakota Highway Patrol, was traveling east on a four lane street in Fargo when he saw a westbound white Buick Riviera "weave up on to the curb and then come across both westbound lanes toward my car at an angle." Stanley "felt like I was going to get hit, that's why I was initially going to stop her." Stanley turned his car around, activated the overhead lights, and followed the Buick that was weaving and traveling between 10 to 15 miles per hour in a 30 mile per hour zone. He followed it "for probably 12, 15 blocks" before it stopped in a parking lot.

Stanley approached the driver's side of the Buick, driven by Mayo, and tapped on the window. Stanley testified Mayo

> was just staring straight ahead at that time, and I asked for her driver's license. She reached in her purse, grabbed out ... her billfold and it turned upside down and there was quite an amount of money that fell out and some credit cards that fell on the floor. I had asked her for her driver's license and asked her to take it out of there. She took some time in trying to get her license out of the billfold and never did. After some time, I just had her hand it out to me, and I just placed it on the roof of the car. I asked her to step out of the vehicle and come back to my car....

Stanley testified that he could smell a strong odor of alcohol on Mayo's breath, and that her eyes were "just glassy, and red and watery, and bloodshot."

Stanley requested Mayo perform a field sobriety test by counting backwards from 65 to 55, and she did so successfully. Because Mayo was "quite upset," Stanley said he was unable to perform other field sobriety tests. After giving her the implied consent advisory, Stanley asked Mayo several times if she would take an Alco–Sensor screening test. According to Stanley,

> she never gave me a no. She was crying and shook her head no, and I would say, ... you're shaking your head no, does that mean you['re] not going to take it. I'd get no response.... I had the machine in my hand, I go, if you're not going to take it, I'm going to mark it down as a refusal, and that's what I did.

Stanley arrested Mayo for drunk driving and took her to jail.

On the way, Mayo asked to be allowed to contact an attorney. Officers at the jail made a telephone and telephone book available to her. Mayo, a Cavalier resident, said she was not sure who to call and asked if she could call her husband. The officers told her the only call she could make before making the chemical test decision was to an attorney, but that, afterward, she could call whoever she wanted. Mayo did not telephone an attorney.

After a short time, Stanley read the implied consent advisory to Mayo and requested that she take an Intoxilyzer test. According to Stanley, Mayo responded by saying "I can't hear you and [she] turned to face the wall." Stanley repeated the advisory in a paraphrased form and Mayo responded, "why are you doing this to me; why am I here; I didn't do anything wrong...." Stanley marked Mayo for a refusal.

At the administrative hearing, Mayo testified about her marital problems and said she drank only two glasses of wine during the seven hours before her arrest. She testified that, while being asked to take the Intoxilyzer test, she was using certain techniques instructed by her mental health professional to allow her to cope with stressful situations. Mayo's psychologist testified that she suffered from an anxiety disorder, a depressive disorder, and a post-traumatic stress disorder resulting from physical, verbal, and possibly sexual abuse as a child that can cause obsessive behavior. The psychologist opined that, given Mayo's recent mental health history and family problems, it was unlikely she could make a knowing and conscious decision about taking the Alco–Sensor and Intoxilyzer tests.

The hearing officer for the Department revoked her license, finding that Stanley had reasonable grounds to believe Mayo had been driving under the influence and that Mayo made a "knowing and conscious refusal" of the tests. The district court affirmed.

■ On appeal, Mayo asserts that: (1) Stanley had no constitutional grounds to request an Alco–Sensor test; (2) she was unable to knowingly and consciously refuse either the Alco–Sensor test or the Intoxilyzer test; and (3) the jail officers' refusal to allow her to consult with her husband before making the chemical test decision violated her statutory right to counsel. As *Sabinash v. Director of Dept. of Transp.*, 509 N.W.2d 61, 63 (N.D.1993) and NDCC 28–32–19 tell us, we must affirm the Department's decision if: the findings of fact are supported by a preponderance of the evidence; the conclusions of law are sustained by the findings of fact; the decision is supported by the conclusions of law; and the decision is in accordance with the law.

I

■ Mayo urges that Stanley needed probable cause to arrest her for driving under the influence of alcohol before requesting that she submit to the Alco–Sensor screening test. While Mayo relies on *People v. Carlson*, 677 P.2d 310 (Colo.1984), to that effect, we have not yet decided whether an on-site screening test may be given by a law enforcement officer without probable cause to believe a detainee has driven under the influence of alcohol. *See State v. Goeman*, 431 N.W.2d 290, 291 n. 1 (N.D.1988); *State v. Pitman*, 427 N.W.2d 337, 344 (N.D.1988). We need not decide here either because, even if probable cause was constitutionally required for this Alco–Sensor test, Stanley had the probable cause necessary to arrest Mayo before giving the test.

■ In assessing whether there is probable cause to arrest, it is not necessary that the officer have knowledge of facts sufficient to establish guilt; rather, all that is necessary is knowledge that would give a prudent person reasonable grounds to believe a violation of the law has occurred. *Goeman*, 431 N.W.2d at 292. Mayo's driving was exceptionally erratic. Stanley saw Mayo's Buick weave up onto the curb of a city street and then cross both westbound lanes at an angle toward his squad car. Stanley was concerned that the Buick would continue on and strike his car. With his squad car's overhead lights activated, Stanley pursued the weaving and unusually slow moving Buick for nearly 15 blocks before Mayo stopped. Stanley noticed a strong odor of alcohol on Mayo's breath and that she had glassy, red, watery,

and bloodshot eyes. Mayo had difficulty locating her drivers license. From these circumstances, we conclude that Stanley had probable cause to arrest Mayo for drunk driving before he attempted to give her the Alco–Sensor screening test.

## II

■ Mayo argues that, before her driving privileges may be properly revoked, she must be capable of making a knowing and conscious decision, and that the evidence here establishes that she could not make a knowing and conscious decision to take either the Alco–Sensor screening test or the Intoxilyzer test. We have not ruled whether a driver must be capable of making a knowing and conscious decision about a test for the Department to revoke that driver's license for a refusal. *Compare Com., Dept. of Transp. v. Zeltins,* 150 Pa.Cmwlth. 44, 614 A.2d 349, 353 (1992) ("Once DOT has established the requisite elements, the burden shifts to the driver to prove by competent evidence that he or she was physically unable to knowingly and consciously refuse chemical testing.") Still, we need not decide the question here because the Department's hearing officer found Mayo made a knowing and conscious refusal to take the Alco–Sensor and Intoxilyzer tests, and that finding is supported by a preponderance of the evidence.

Although Mayo's psychologist gave his opinion that a person in Mayo's condition would not make a rational or knowing decision to not take the tests, he equivocated about Mayo's physical and emotional condition and her ability to make a knowing and conscious refusal:

> DR. MOSER: ... In this case when Patty gets so wrapped up in negative thinking and so distraught about the problems that she's having, she does not exercise good judgment.
>
> MS. LOBERG: Okay.
>
> DR. MOSER: And proof of that is that she's made some suicidal attempts at those times.

\* \* \* \* \* \*

> DR. MOSER: My personal thought here is that it's a rational decision to take the Breathalyzer test in that situation.
>
> MS. LOBERG: Now ...
>
> DR. MOSER: That's what I'd do.
>
> MS. LOBERG: Is there a difference between making a rational decision and making a knowing decision?
>
> DR. MOSER: I don't know in the legal sense if there's a difference there.
>
> MS. LOBERG: Is there difference in the medical sense with you?
>
> DR. MOSER: Well, I think it's the same thing.
>
> MS. LOBERG: You think it's the same thing?
>
> DR. MOSER: Yeah. I don't think that she was unaware of what she was doing if that's ... if you mean that.
>
> MS. LOBERG: Okay.
>
> DR. MOSER: But I just think that in her emotional state that she was not exercising good judgment and that she has a history of not exercising good judgment when she is in that kind of emotional state.

The hearing officer could reasonably decline to equate a failure to exercise good judgment with an inability to make a knowing and conscious decision. We conclude that the hearing officer reasonably found that Mayo made a knowing and conscious refusal to submit to the Alco–Sensor and Intoxilyzer tests.

■ Mayo argues that, even if she could make a knowing and conscious refusal, she "did not indicate in any way, verbally or non-verbally, that she did not want to take" the Intoxilyzer test. However, the failure to submit to a test, whether by stubborn silence or by a negative answer, can be a refusal. *North Dakota Dept. of Transp. v. DuPaul,* 487 N.W.2d 593, 597 (N.D.1992). A physical failure to cooperate may also amount to a refusal. *See Jorgenson v. Dept. of Transp.,* 498 N.W.2d 167 (N.D.1993); *Geiger v. Hjelle,* 396 N.W.2d 302 (N.D.1986). Here, Stanley asked Mayo several times if she would take the Intoxilyzer test. Mayo responded by saying she could not hear him and turned to face the wall. She also asked why he was doing this to her. Stanley then told her that,

if she did not do or say anything, he would mark it down as a refusal. The hearing officer's finding that Mayo's actions were a refusal to submit to the Intoxilyzer test is supported by a preponderance of the evidence.

## III

■ Mayo argues that the jail officers' refusal to allow her to call her husband before deciding whether to take the Intoxilyzer test violated her statutory right to counsel. We disagree.

In *Kuntz v. State Highway Comm'r*, 405 N.W.2d 285, 290 (N.D.1987), a majority of this court held that a person arrested for drunk driving has a limited statutory right under NDCC 29-05-20 to consult with counsel before deciding whether to submit to a chemical test. Mayo asserts that we, like Minnesota courts, should extend this right and hold that police are required to allow the driver "to contact a family member to obtain the name and telephone number of an attorney." *Clough v. Commissioner of Pub. Safety*, 360 N.W.2d 428, 429 (Minn.Ct.App.1985). We decline to do so in this case.

First, Minnesota now recognizes a limited state constitutional right, rather than a statutory right, to counsel under these circumstances. *See Friedman v. Commissioner of Public Safety*, 473 N.W.2d 828 (Minn.1991). That right has been extended by decisions to allow a driver to contact a family member to obtain an attorney's name and telephone number. *See State v. Karau*, 496 N.W.2d 416, 418 (Minn.Ct.App.1993); *but compare State v. Christiansen*, 515 N.W.2d 110, 113 (Minn.Ct.App.1994) (police officers need not permit a driver, even if he is a juvenile, to call a parent merely to obtain advice); *Stefano v. Commissioner of Pub. Safety*, 358 N.W.2d 83, 84–85 (Minn.Ct.App.1984) (same). This court has not held that an accused, arrested for driving under the influence, has a constitutional right to consult with counsel before deciding whether to submit to chemical testing. *City of Mandan v. Jewett*, 517 N.W.2d 640, 641 (N.D.1994). Also, although the proposition is stated in broad terms in both *Clough* and *Friedman*, they were factual situations where the drivers wanted to

telephone their parents. While *Clough* extended Minnesota's then-existing statutory right to counsel, our rulings have not gone that far.

Rather, a majority of this court in *Olson v. N.D. Dept. of Transp. Director*, 523 N.W.2d 258, 260 (N.D.1994), held that a separate specific statute, NDCC 39-20-01, requires that a law enforcement officer who had telephonic contact with an arrested juvenile driver's parent read the implied consent advisory to the parent. Reasoning that, by a specific statute, the "legislature has identified . . . [a] situation in which juveniles need the protection and assistance of their parents either to contact an attorney for them or to give them advice on whether or not to take a chemical test," the majority ruled in *Olson* at 261, "[i]f the statutory directives are not complied with, then a child's subsequent failure to take a chemical test is not a refusal for purposes of section 39-20-01." Unlike the situation with juveniles and their parents, we find no express legislative directive allowing an adult driver to contact a family member before making a chemical test decision.

We understand Mayo's belief that a family member will often be a reasonable and logical source for assistance in finding a lawyer. When the call to the family would be a local call without any charge for long distance, we see no reason why the police should prevent a call to the driver's family for information to locate the family's lawyer, so long as the time for phone calls, the testing, and the booking process is not unduly extended. Here, however, Mayo's call to her spouse would have been long distance to Cavalier from Fargo, and the record is unclear as to whether Mayo could have made it without expense to the jail. The jail has no duty to underwrite long-distance calls by arrested drivers before a chemical test decision is made, even though it should not interfere with a driver's efforts to locate a lawyer so long as the arrest procedure is not unduly delayed.

We also recognize, however, the concerns expressed by the Department over the practical problems in requiring law enforcement officers to accommodate requests for multiple phone calls to family members, friends, and others before a driver decides what to

do. Therefore, we conclude that Mayo had no personal right in this case to contact her spouse by long distance before making a chemical test decision, even if the purpose of the request was to obtain the name and telephone number of an attorney.

Here, Mayo was provided with a telephone and a telephone book, and was given an opportunity to call an attorney. She did not do so. Similar to circumstances in *North Dakota Dept. of Transp. v. DuPaul*, 487 N.W.2d 593, 596–597 (N.D.1992), and in *Ehrlich v. Backes*, 477 N.W.2d 211, 214 (N.D. 1991), this record supports a finding that Mayo had a reasonable opportunity to consult with an attorney before deciding whether to take the chemical test.

The hearing officer's findings are supported by a preponderance of the evidence, the conclusions are sustained by the findings, and the decision is supported by the conclusions and is in accordance with the law. The revocation is affirmed.

VANDE WALLE, C.J., and LEVINE, NEUMANN and SANDSTROM, JJ., concur.