1999 ND 134

**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Charles E. SYVERTSON, Defendant and Appellant.**

No. 980027.

Supreme Court of North Dakota.

July 13, 1999.

Rehearing Denied July 29, 1999.

Wade Lykken Webb, Assistant State's Attorney, Fargo, for plaintiff and appellee.

Charles E. Syvertson, Bismarck, pro se.

Joe A. Johnson, Fargo, submitted brief for defendant and appellant.

MARING, Justice.

[¶1] Charles E. Syvertson appealed from a criminal judgment entered on a jury verdict finding him guilty of two class B felony counts of gross sexual imposition in violation of N.D.C.C. § 12.1–20–03. We conclude the trial court did not err in refusing to suppress Syvertson's confession, Syvertson failed to show any prejudice resulting from the disclosure of the prosecution's sealed notice of intent to have Syvertson, if convicted, sentenced as a dangerous special or habitual offender, and any error the trial court committed in admitting parts of Syvertson's pretrial psychiatric evaluation at the sentencing hearing was harmless beyond a reasonable doubt. We affirm.

I

[¶2] On May 17, 1997, Syvertson was arrested and jailed in Wahpeton on charges unrelated to this appeal. On May 19, 1997, Sergeant Don Hukee of the Wahpeton Police Department interviewed Syvertson about the pending charges against him and pictures of children found in Syvertson's car. Syvertson was brought from his cell in the Richland County Jail to

Hukee's office for the interview. Hukee did not inform Syvertson of his *Miranda* rights[1] at any time during this first interview.

[¶ 3] While Syvertson was being held in the Richland County Jail, Syvertson's daughter met with a social worker in Minnesota and told her Syvertson had touched her sexually in Fargo about three years earlier when she was seven years old. The social worker, who handled intake assessments to determine the merits of child abuse allegations, forwarded a report to the Wahpeton Police Department. As a result of the report, Syvertson, while in jail, was also served with a restraining order to stay away from his daughter.

[¶ 4] About 4 a.m. on May 22, 1997, Syvertson gave a jail guard two notes and asked that he give them to the officer who arrested him. Later that day, Hukee received Syvertson's notes from another police officer. One of the notes gave police permission to retrieve items from the trunk of Syvertson's car. The other note said:

To: Cass County States Attorney

My daughter accused me of melosting (sic) her in the year of 1993 and I would like to let it be known that she was telling the truth. The incident occured (sic) in Fargo N.D. and no such incident has happend (sic) since. Dated this 21 May 1998(sic).

Charles E. Syvertson

[¶ 5] After receiving the notes, Hukee conducted a second interview with Syvertson in his office. Near the beginning of this interview, Hukee informed Syvertson of his *Miranda* rights and Syvertson responded that he understood them. During this interview, Hukee repeatedly encouraged Syvertson to confess to the molestation of his daughter, assured him he was not interested in arresting him, and was only interested in helping him and his daughter. Syvertson confessed in detail to

molesting his daughter. The confession was videotaped.

[¶ 6] In July 1997, Syvertson was charged in Cass County with two counts of gross sexual imposition. The information alleged Syvertson had sexual contact with his daughter by placing his hand or fingers in her vaginal area on two occasions about one month apart in late 1993 or early 1994.

[¶ 7] Shortly after being charged, Syvertson, through court-appointed defense counsel, requested a psychological examination under N.D.C.C. §§ 12.1–04–06 and 12.1–04.1–02. The trial court granted the motion. The order of commitment to the State Hospital specified the purpose of the examination was to determine:

1) Defendant's fitness to proceed and assist in his own defense;

2) Whether Defendant lacks the substantial capacity to comprehend the harmful nature or consequences of the alleged conduct with which he is charged;

and,

3) Whether the alleged conduct with which Defendant is charged is the result of a loss or serious distortion of the Defendant's capacity to recognize reality.

[¶ 8] In the report of the psychiatric evaluation, the doctor concluded Syvertson was fit to proceed and assist in his own defense, did not lack substantial capacity to comprehend the harmful nature of his acts, and the alleged conduct was not the result of a loss or serious distortion of his ability to recognize reality. The doctor said "[i]t is our feeling that his behavior is a result of a sexual deviation best labeled as pedophilia and that the patient should be considered quite dangerous and capable of being quite aggressive." The doctor also said "[w]e could find no evidence of any thought disorder but clear evidence of a lot of sexual pre-occupation, difficulty dealing with anger and broad underlying

1. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

destructive and aggressive impulses that make this individual quite frightening."

[¶ 9] In October 1997, the State filed a notice of intent to have Syvertson, if convicted, sentenced as a dangerous special or habitual offender. On the State's motion, the trial court sealed the request from public inspection. Nevertheless, the Forum, a Fargo newspaper, reported before trial "[p]rosecutors have filed a sealed notice with the court of their intent to have Syvertson, if convicted, be sentenced as a special dangerous offender or habitual offender, which would increase the potential sentences he faces."

[¶ 10] In December 1997, Syvertson filed several motions with the trial court, some of them pro se. Syvertson filed a notice of his intention to rely on the defense of lack of criminal responsibility by reason of mental disease or defect and moved to have the State's attempt to have him sentenced as a special dangerous or habitual offender dropped because of the newspaper's disclosure of that information to the public. He also asked for a change of venue because of the disclosure. Syvertson also moved to suppress various statements he made while in custody because *Miranda* warnings were not given before his first interview with Hukee.

[¶ 11] The trial court granted Syvertson's suppression motion in part, ruling statements he made during his first interview with Hukee would be suppressed because he was not given *Miranda* warnings. However, the court refused to suppress statements Syvertson made during the second interview with Hukee after he had been given *Miranda* warnings. The court found those statements were made voluntarily. The court also denied Syvertson's motion for change of venue because of the newspaper's disclosure of the State's intention to have Syvertson sentenced as a special dangerous or habitual offender be-

cause "as of this point in time the basis for a change of venue does not exist...."

[¶ 12] Four days before trial, the court granted Syvertson's request to represent himself during the trial, but appointed Syvertson's court-appointed attorney to serve as standby counsel. During trial, standby counsel questioned the victim and Syvertson when he took the stand to testify. Otherwise, Syvertson conducted his own defense. The jury returned a verdict of guilty on both counts. At the sentencing hearing, the State, over Syvertson's objection, presented certified copies of Syvertson's five prior felony convictions which were at least class C or above and were committed when he was an adult. The State requested Syvertson be sentenced as a habitual offender and given a total of 40 years in prison. The State, again over Syvertson's objection, quoted from the pretrial psychiatric evaluation during its sentencing argument. The trial court found Syvertson was a "habitual offender" under N.D.C.C. § 12.1–32–09(1)(c) because he had previously been convicted of two felonies, class C and above, and sentenced him to consecutive sentences of 15 years on each count, for a total of 30 years in prison. Syvertson[2] appealed.

II

[¶ 13] Syvertson contends the trial court erred in denying his motion to suppress statements he made during his second interview with Hukee.

[¶ 14] The trial court's disposition of a motion to suppress will not be reversed if, after conflicts in the testimony are resolved in favor of affirmance, there is sufficient competent evidence fairly capable of supporting the trial court's findings, and the decision is not contrary to the manifest weight of the evidence. *State v. Garrett*, 1998 ND 173, ¶ 11, 584 N.W.2d 502. This standard of review recognizes the importance of the trial court's opportu-

---

2. Syvertson was originally given a different court-appointed attorney to handle the appeal, but after briefs were filed, he requested

he be allowed to handle the appeal pro se. The trial court allowed him to proceed with this appeal pro se.

nity to observe the witnesses and assess their credibility, and we accord great deference to its decision in suppression matters. *State v. Sabinash,* 1998 ND 32, ¶ 8, 574 N.W.2d 827.

[¶ 15] Syvertson first claims all of his statements should be suppressed because he was not provided counsel after he requested an attorney when he was first booked into the Richland County Jail in Wahpeton on charges unrelated to this appeal. On May 17, 1997, Syvertson was arrested and given citations for open container, illegal possession of marijuana, driving under the influence, driving under suspension and possession of materials depicting sexual conduct by a minor in violation of N.D.C.C. § 12.1–27.2–04.1. Although the jailers and officers either denied or could not remember if Syvertson had requested counsel when Syvertson questioned them during the trial, Syvertson relies on part of an arresting officer's report of his driving under the influence charge to support his argument:

UPON ARRIVING AT THE JAIL I READ THIS SUBJECT HIS MIRANDA WARNING. TO WHICH THE SUBJECT STATED THAT HE WANTED A LAWYER AND THAT I HAD TO GET HIM ONE. I INFORMED HIM THAT I WOULD AFFORD HIM EVERY OPPORTUNITY TO CALL A LAWYER AND GET HIM A PHONE BOOK AND A PHONE TO USE. THE SUBJECT STATED THAT HE DID NOT WANT TO CALL A LAWYER AND HE WANTED ME TO GET HIM ONE.

[¶ 16] This undisputed evidence shows Syvertson was offered the opportunity to contact a lawyer, but simply failed to do so. The officer was not obligated to obtain a lawyer for Syvertson. *See North Dakota Department of Transportation v. DuPaul,* 487 N.W.2d 593, 596–97 (N.D. 1992). *See also Mayo v. Moore,* 527 N.W.2d 257, 262 (N.D.1995). Assuming Syvertson's argument is that he was indigent and could not afford an attorney,

Syvertson had no right to a court-appointed attorney for his arrest and booking, which took place before his initial court appearance. *See DuPaul,* 487 N.W.2d at 597. Therefore, Syvertson's claim all subsequent statements should have been suppressed because he was not provided counsel for his arrest and booking on other charges is without merit.

[¶ 17] Syvertson argues his confession during the second interview with Hukee was involuntary and was tainted by the absence of *Miranda* warnings during the first interview. Voluntariness challenges to statements given to law enforcement officers may be based on due process grounds or self-incrimination grounds. *State v. Murray,* 510 N.W.2d 107, 110 (N.D.1994). When a confession is challenged on due process grounds, as it is in this case, the ultimate inquiry is whether the confession was voluntary in the sense that it was the product of the defendant's free choice, rather than the product of coercion. *Sabinash,* 1998 ND 32, ¶ 11, 574 N.W.2d 827. While coercion, by itself, will not invalidate a confession, *Murray,* 510 N.W.2d at 111, a confession will be considered the product of coercion if the defendant's will is overborne at the time the confession is given. *State v. Winkler,* 552 N.W.2d 347, 356 (N.D.1996).

[¶ 18] The United States Supreme Court's decision in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), is instructive. In *Elstad,* the Court was asked to determine whether a defendant's statements, which were made without the required *Miranda* warnings at the defendant's home, rendered inadmissible a subsequent written confession which was made after the defendant had been transported to the police station and given *Miranda* warnings. The defendant contended his subsequent written confession had been tainted by his initial statement which was made without proper *Miranda* warnings and, therefore, was barred by the fruit-of-the-poisonous-tree doctrine. The

Court rejected the fruit-of-the-poisonous-tree argument and held "[a] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Elstad,* 470 U.S. at 318, 105 S.Ct. 1285.

[¶ 19] The Court distinguished presumptive coercion resulting from the absence of *Miranda* warnings from actual coercion through the use of coercive or improper methods by the police, and said statements obtained in violation of *Miranda,* although they must be suppressed as presumptively coercive, may yet be deemed voluntary in fact:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.

*Elstad,* 470 U.S. at 309, 105 S.Ct. 1285. Under *Elstad's* rationale, if a defendant at first makes a statement voluntarily, without actual coercion, a subsequent voluntary statement, made after receiving *Miranda* warnings and voluntarily waiving those rights, is untainted and admissible evidence. *See, e.g., State v. Connery,* 441 N.W.2d 651, 653 n. 2 (N.D.1989); *United States v. Polanco,* 93 F.3d 555, 560–61 (9th Cir.1996); *United States v. Carter,* 884 F.2d 368, 372–73 (8th Cir.1989); *State v. Pebria,* 85 Hawai'i 171, 938 P.2d 1190, 1195–96 (Hawai'i Ct.App.1997); *State v. Hicks,* 333 N.C. 467, 428 S.E.2d 167, 175–76 (1993).

[¶ 20] The totality of the circumstances must be examined to determine voluntariness. *State v. Taillon,* 470 N.W.2d 226, 228 (N.D.1991). The inquiry focuses on two non-determinative elements: (1) the characteristics and conditions of the accused at the time of the confession, including the age, sex, race, education level, physical or mental condition, and prior experience with police; and (2) the details of the setting in which the confession was obtained, including the duration and conditions of detention, police attitude toward the defendant, and the diverse pressures that sap the accused's powers of resistance or self-control. *State v. Lefthand,* 523 N.W.2d 63, 68 (N.D.1994).

[¶ 21] Our review in this case is hampered, because the trial court failed to delineate the legal basis for its ruling or to make findings of fact. After suppressing statements Syvertson made during the first interview,[3] because no *Miranda* warnings were given, the court simply ruled statements made during the second interview after *Miranda* warnings were given, would be admissible because they were "voluntary." We conclude the record supports the trial court's refusal to suppress statements Syvertson made during the second interview.

[¶ 22] At the time of the interviews, Syvertson was 36 years old and was no stranger to the criminal justice system. Between 1989 and 1993, Syvertson was convicted of breaking into a motor vehicle, arson, burglary, and sale, delivery and possession of controlled substances. He had spent time in prison.

[¶ 23] Both interviews took place in Hukee's office and were not lengthy. Hukee described his office as being 12 feet long by 12 feet wide with a desk, five chairs, and a television which had been hollowed out and fitted with a video camera. Hukee and Syvertson were usually alone during both interviews with Hukee seated across the desk from Syvertson.

---

**3.** The record does not clearly reflect whether the trial court actually viewed the videotape of Hukee's first interview with Syvertson. In any event, a trial court is presumed to have done its duty. *See Baird v. City of Williston,* 58 N.D. 478, 492–93, 226 N.W. 608, 613 (1929); *Erickson v. Wiper,* 33 N.D. 193, 227, 157 N.W. 592, 603 (1916).

According to Hukee, the first interview was a "fishing trip, not knowing what kind of an individual I was dealing with or who was in our community." The questioning focused upon pictures found in Syvertson's vehicle when he was arrested. Hukee had no knowledge of the allegations which had been made by Syvertson's daughter, but encouraged Syvertson to tell him about any children he may have harmed. Syvertson resisted Hukee's attempts to elicit incriminating information from him. Syvertson claims Hukee conducted the interview in a "paternalistic" and "sympathetic" manner and suggested he was not interested in arresting Syvertson for anything, but was only trying to help him.

[¶ 24] Syvertson claims he was in a severely depressed psychological state, was delusional and uncooperative following the arrest, and tried to kill himself by picking his arm with a pen. However, the second interview was conducted three days later and was prompted by the note Syvertson gave the jailer[4] stating Syvertson's daughter was telling the truth about him molesting her. A correctional officer described Syvertson's physical and mental state at this time as "pretty sedated," "calm" and "mellow." The officer who brought Syvertson to the second interview told Hukee he had visited with Syvertson and "the most important thing is that we get him some help or something like that, you know, get him in the right direction." After Hukee advised him of his *Miranda* rights, Syvertson responded that he understood them. Hukee continued to assure Syvertson throughout the interview he was interested only in getting help for him and his daughter, and not in having him prosecuted. During trial, Hukee testified part of his interview technique with Syvertson involved treating him delicately and softly in order to get him to relax and divulge what had happened. Hukee also admitted he lied to Syvertson and Syvertson "fell

for it." Syvertson confessed in detail to molesting his daughter. The part of the taped confession taken after *Miranda* warnings were given was played to the jury.

[¶ 25] Police conduct is an important component of the details of the setting in which a confession is obtained. *State v. Pickar*, 453 N.W.2d 783, 786 (N.D. 1990). Syvertson does not claim that his confession was involuntary because he was threatened with physical harm if he did not confess, or because the officers used interrogation techniques normally associated with being "so offensive to a civilized system of justice that they must be condemned," or as being "revolting to the sense of justice." *Colorado v. Connelly*, 479 U.S. 157, 163, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). *See also Murray*, 510 N.W.2d at 111. Rather, Syvertson's main claim throughout has been he was tricked into believing Hukee's assurances he was only interested in helping him, and not prosecuting him. While promises implying leniency or threats of prosecution are part of the totality of the circumstances to be weighed by the trial court, without more, they are insufficiently coercive to render a confession involuntary. *State v. Bjornson*, 531 N.W.2d 315, 319 (N.D.1995). The First Circuit Court of Appeals, in *United States v. Byram*, 145 F.3d 405, 408 (1st Cir.1998), recently explained:

> Certainly some types of police trickery can entail coercion: consider a confession obtained because the police falsely threatened to take a suspect's child away from her if she did not cooperate. *See Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). *See also Spano v. New York*, 360 U.S. 315, 323, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).

> But trickery is not automatically coercion. Indeed, the police commonly engage in such ruses as suggesting to a

---

4. During a motion in limine held outside the jury's presence at the trial, the trial court found the note was a "voluntary" statement by Syvertson. Syvertson does not separately challenge the voluntariness of the note.

suspect that a confederate has just confessed or that police have or will secure physical evidence against the suspect. While the line between ruse and coercion is sometimes blurred, confessions procured by deceits have been held voluntary in a number of situations. *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (confession obtained by false statement that co-conspirator had confessed); ...

Given the narrowed definition of coercion in *Connelly*, it would be very hard to treat as *coercion* a false assurance to a suspect that he was not in danger of prosecution.

(Emphasis in original.) Given the circumstances of both the first and second interviews, we cannot say Hukee's police tactics amounted to coercion in the constitutional sense of the term.

[¶ 26] Syvertson relies on our decision in *Taillon*, 470 N.W.2d 226, to support his argument the confession was involuntary. While some of the circumstances in *Taillon* are similar to this case, *Taillon* is distinguishable. Although the interrogating officer in *Taillon* used sympathy and paternalism and assured the defendant he wanted to help him, the conduct was more egregious than in this case, because the defendant attempted to stop the interview with the police and requested to speak to an attorney. *See Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (holding an accused who invoked his right to counsel during interrogation can only waive that right if there is a showing of voluntariness and a knowing and intelligent relinquishment of that right). Most important, however, we affirmed the trial court's suppression order in that case, stating it was the duty of the trial court, not this Court, to assign the weight to be given the circumstances surrounding the defendant's incriminating statements. *Taillon*, 470 N.W.2d at 230.

[¶ 27] We conclude the trial court's ruling Syvertson's statements made during both interviews with Hukee were volun-

tary in fact is supported by sufficient competent evidence and is not against the manifest weight of the evidence. Because Syvertson was not informed of his *Miranda* rights during the first interview, the trial court properly suppressed any incriminating statements made during that interview. We further conclude Syvertson's waiver of rights and statements made after being informed of his *Miranda* rights during the second interview were not tainted by the first unwarned interview. The first interview did not involve any discussion of Syvertson molesting his daughter and Hukee was unaware of her allegations at that time. Syvertson initiated contact with the police regarding the molestation of his daughter between the first and second interviews. Indeed, the Supreme Court has said even a suspect who has expressed a desire to deal with police only through counsel may be subject to further interrogation by authorities if "the accused himself initiates further communication, exchanges, or conversations with the police." *Arizona v. Roberson*, 486 U.S. 675, 677, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988); *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Syvertson's note attesting to the truthfulness of his daughter's allegations qualifies as the "initiation" of a conversation within the meaning of *Roberson* and *Edwards*. *Compare Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (holding by asking "[w]ell, what is going to happen to me now?", respondent "initiated" further conversation). Because Syvertson was given *Miranda* warnings at the beginning of the second interview and voluntarily waived those rights, the trial court properly refused to suppress incriminating statements made during that interview.

### III

[¶ 28] Syvertson argues the State forfeited the right to have him sentenced as a dangerous special or habitual offender because, although the trial court sealed the

State's request to sentence him in that manner, the information was disclosed before trial in an article in a Fargo newspaper.

[¶ 29] Extended sentences for dangerous special and habitual offenders are provided for in N.D.C.C. § 12.1–32–09, which states in subsection 2:

> In no case may the fact that the prosecuting attorney is seeking sentencing of the defendant as a dangerous special offender or a habitual offender be disclosed to the jury. If the court finds that the filing of the notice as a public record may prejudice fair consideration of a pending criminal matter, it may order the notice sealed and the notice shall not be subject to subpoena or public inspection during the pendency of such criminal matter, except on order of the court, but shall be subject to inspection by the defendant alleged to be a dangerous special offender or a habitual offender and the offender's counsel.

[¶ 30] It is unclear from the record how the newspaper obtained the State's notice of intention to seek an enhanced sentence after the trial court granted the State's request to have the notice sealed. Syvertson's claim the disclosure is grounds to vacate his enhanced sentence is premised on federal cases interpreting former federal enhanced sentencing statutes, since repealed. *See* 18 U.S.C.A. § 3575(a); 21 U.S.C.A. § 849(a). Those cases hold even unintentional disclosures of the government's intent to seek an enhanced sentence to the presiding judge of the case bars the government's use of the enhanced sentencing provisions. *See, e.g., United States v. Darwin,* 742 F.2d 1325, 1328 (11th Cir.1984); *United States v. Taylor,* 716 F.2d 701, 713 (9th Cir.1983). But those federal statutes, unlike N.D.C.C. § 12.1–32–09, specifically said "[i]n no case shall the fact that the defendant is alleged to be a dangerous special (drug) offender ... be disclosed ... before any ... verdict or finding of guilty to the presiding judge without the consent of the parties." 18

U.S.C.A. § 3575(a), 21 U.S.C.A. § 849(a). Federal courts strictly construed those provisions to impose strict liability on the government to insure the trial judge did not learn of the notice prematurely. *See Darwin; Taylor.* The North Dakota enhanced sentencing statute contains no language prohibiting the trial judge from learning of the notice prematurely.

[¶ 31] In this case, N.D.C.C. § 12.1–32–09(2) gives the trial court discretion to seal from public inspection the notice of intent to seek an enhanced sentence if the filing "may prejudice fair consideration of a pending criminal matter, ..." The obvious intention of the statute is to keep this information from being disclosed to the jury, but Syvertson does not claim prejudice because jurors were aware of the filing. The trial court at the sentencing hearing specifically found Syvertson had made "no showing to this Court whatsoever that a jury had any knowledge of nor was prejudiced by any newspaper disclosure." The trial court said nothing disclosed during voir dire, which Syvertson conducted himself, indicated any of the jurors had knowledge of the State's intention to seek an enhanced sentence. Under these circumstances, we conclude the trial court did not err in sentencing Syvertson under the provisions of N.D.C.C. § 12.1–32–09.

## IV

[¶ 32] Syvertson contends his sentence must be vacated, because the trial court relied on the pretrial psychiatric evaluation in determining the sentence.

[¶ 33] In *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Supreme Court held a capital defendant's fifth and sixth amendment rights were violated when a state psychiatrist testified during the penalty phase of a capital case that, based on statements made at a competency hearing ordered by the court *sua sponte,* the defendant was a severe sociopath whose condition could not be remed-

ied. The trial court in *Estelle*, 451 U.S. at 464 101 S.Ct. 1866, had ordered a psychiatric evaluation for the "limited, neutral purpose of determining his competency to stand trial," but the psychiatrist testified as to the defendant's future dangerousness based on statements the defendant made and omitted in reciting the details of the crime. The Court held "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Estelle*, 451 U.S. at 468, 101 S.Ct. 1866. The Court concluded use of this psychiatric testimony violated the defendant's fifth amendment privilege against self-incrimination and his sixth amendment right to counsel, because he had not been warned of his *Miranda* rights and his counsel had not been notified that an examination was to be conducted. *Estelle*, 451 U.S. at 463, 471, 101 S.Ct. 1866.

[¶ 34] The Supreme Court clarified the *Estelle* principles in *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). In *Buchanan*, a defendant charged with murder requested a psychological examination to determine whether he should be hospitalized for psychiatric treatment. At trial, the defendant attempted to substantiate his defense of extreme emotional disturbance by having a social worker read excerpts from the reports of the psychological examination. The prosecution responded by having the social worker read from other psychological reports reflecting the defendant's composed, manipulative character. The Court rejected the contention the prosecution's use of incriminating psychological reports violated the defendant's fifth and sixth amendment rights, holding "if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." *Buchanan*, 483 U.S. at 422–23,

107 S.Ct. 2906. The Court noted the report did not describe any statement made by the defendant dealing with the offenses for which he was charged, and concluded use of the report for "this limited rebuttal purpose" was not a fifth amendment violation. *Buchanan*, 483 U.S. at 424, 107 S.Ct. 2906.

[¶ 35] The holdings of *Estelle* and *Buchanan* are succinctly summarized in *State v. Thompson*, 768 S.W.2d 239, 248 (Tenn. 1989):

[E]ven when an exception is present the evidence may be used only to rebut or impeach defendant's proof and if it is the only means of doing so; it may not include incriminating statements about the crime; and it must not exceed the scope of the purpose for which the evaluation was requested. To this extent a defendant has waived the privilege against self-incrimination by requesting the examination. Where the evaluation is requested through a defendant's attorney, there is no denial of defendant's right to consult his counsel.

*See also, e.g., State v. Jensen*, 333 N.W.2d 686, 696 (N.D.1983); *Vanderbilt v. Collins*, 994 F.2d 189, 196–98 (5th Cir.1993); *Brown v. Butler*, 876 F.2d 427, 429–30 (5th Cir.1989); *Wilkens v. State*, 847 S.W.2d 547, 550–51 (Tex.Cr.App.1992).

[¶ 36] There has been some dispute whether *Estelle* applies to noncapital sentencing proceedings. *Compare People v. Branch*, 805 P.2d 1075, 1082–83 (Colo.1991) and *People v. Wright*, 431 Mich. 282, 430 N.W.2d 133, 138 n. 13 (1988), indicating *Estelle* applies, *with Baumann v. United States*, 692 F.2d 565, 578 (9th Cir.1982) and *Wolfe v. State*, 562 N.E.2d 414, 418–19 (Ind.1990), indicating *Estelle* does not apply. This Court has applied *Estelle* principles in the past, albeit to the guilt phase of a criminal trial. *See State v. Jensen*, 333 N.W.2d 686, 696–97 (N.D.1983). The United States Supreme Court has recently stated *Estelle* principles do apply in noncapital sentencing proceedings. In *Mitch-*

*ell v. United States,* —— U.S. ——, ——, 119 S.Ct. 1307, 1316, 143 L.Ed.2d 424 (1999), the Supreme Court held the district court imposed an impermissible burden on the exercise of the constitutional right against compelled self-incrimination by holding the defendant's silence against her at the sentencing hearing in a noncapital case. The Court reasoned:

> As the Court stated in *Estelle:* "Any effort by the State to compel [the defendant] to testify against his will at the sentencing hearing clearly would contravene the Fifth Amendment." 451 U.S. at 463, 101 S.Ct. 1866, 68 L.Ed.2d 359. *Estelle* was a capital case, but we find no reason not to apply the principle to noncapital sentencing hearings as well.

*Mitchell,* —— U.S. at ——, 119 S.Ct. at 1314. We conclude *Estelle* principles apply in this case.

[¶ 37] Here the trial court granted Syvertson's pretrial request for a psychiatric evaluation and specified the limited purpose of the examination was to determine Syvertson's competency to stand trial and his competency at the time of the offenses.[5] Although Syvertson's court-appointed counsel filed a notice of intention to rely on the defense of lack of criminal responsibility by reason of mental disease or defect, Syvertson was subsequently allowed to represent himself at trial and Syvertson did not present any mental-status evidence within the meaning of *Estelle* and *Buchanan* during the trial. *See Schneider v. Lynaugh,* 835 F.2d 570, 576 (5th Cir.1988) (holding "the defendant must introduce mental-status evidence that may fairly be characterized as expert testimony before the prosecution may respond with the results of a psychiatric examination") (footnote omitted). Syvertson also presented no mental-status evidence during the sentencing hearing. Nevertheless, the trial court allowed the prosecution during the sentencing hearing, over Syvert-

son's objection, to quote from Syvertson's pretrial psychiatric evaluation report stating there was "clear evidence of a lot of sexual pre-occupation, difficulty dealing with anger, and broad underlying destructive and aggressive impulses that make this individual quite frightening." We conclude the introduction of this evidence violated Syvertson's fifth amendment right against self-incrimination.

[¶ 38] Harmless error analysis applies to the admission of psychiatric evidence in violation of the principles enunciated in *Estelle* and *Buchanan.* *See Satterwhite v. Texas,* 486 U.S. 249, 258, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); *Brown,* 876 F.2d at 430–31. In *State v. Chihanski,* 540 N.W.2d 621, 623–24 (N.D.1995), we stated the test to apply when determining whether a federal constitutional error requires reversal:

> " '[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' " *State v. Flamm,* 351 N.W.2d 108, 110 (N.D. 1984); N.D.R.Crim.P. 52(a), Explanatory Note. In declaring this belief, the court must be convinced "that the error did not contribute to the verdict." *Flamm,* 351 N.W.2d at 110. Furthermore, before making this declaration, the court must review the entire record and determine, in light of all the evidence, the probable effect of any constitutional error upon a criminal defendant's rights. *State v. Schneider,* 270 N.W.2d 787, 793 (N.D.1978); N.D.R.Crim.P. 52(a), Explanatory Note.

Applying this test, we conclude the trial court's error in allowing in evidence parts of Syvertson's pretrial psychiatric evaluation at the sentencing hearing was harmless beyond a reasonable doubt.

[¶ 39] Syvertson was not given an enhanced sentence for being "a dangerous,

---

**5.** Because Syvertson requested the evaluation, there was no violation of his sixth amendment

right to consult with counsel. *See Buchanan.*

mentally abnormal person." N.D.C.C. § 12.1–32–09(1)(a). Rather, Syvertson was sentenced solely as a "habitual offender" under N.D.C.C. § 12.1–32–09(1)(c), which requires a finding that Syvertson is an adult and was convicted of two felonies of class C or above committed at different times when he was an adult. The trial court specifically found this statutory requirement to be a fact, and that finding is supported by the record. This finding, standing alone, supports the enhanced sentence of a total of 30 years in prison, which is a sentence below the statutory maximum of 40 years in prison.

[¶ 40] In sentencing Syvertson, the trial court said "[y]ou have a long history of alcohol and drug abuse and violations as well as what I would consider a preoccupation with sexual activity to the point that I'm of the opinion that you are a predator." However, all of the court's comments for sentencing have a basis in the record apart from the pretrial psychiatric evaluation. The trial court was presented with a Parole and Probation presentence investigation noting "13 prior treatments for alcohol and drug-related issues" at the penitentiary and elsewhere. The presentence investigation spoke of multiple felonies and misdemeanors committed by Syvertson. The presentence investigation included admissions Syvertson made to the probation officer about sexually touching numerous young girls, including his sister. The State also pointed out to the court that, during the second Hukee interview, Syvertson discussed his sexual preoccupation with female children.

[¶ 41] We generally confine appellate review of a criminal sentence to whether the trial court acted within the sentencing limits prescribed by statute, or substantially relied on an impermissible factor. *State v. McClean*, 1998 ND 21, ¶ 4, 575 N.W.2d 200. In this case, the trial

court acted within the sentencing limits and there is no indication the court relied on the pretrial psychiatric evaluation. We conclude the court's error in allowing into evidence parts of the evaluation is harmless beyond a reasonable doubt, and is not grounds for vacating Syvertson's sentence.

### V

[¶ 42] The criminal judgment is affirmed.[6]

[¶ 43] VANDE WALLE, C.J., and NEUMANN and KAPSNER, JJ., concur.

SANDSTROM, Justice, concurring in the result.

[¶ 44] I write separately to note in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the defendant made incriminating admissions in the initial interview. Here, there were none. Indeed, the sexual molestation—the subject of this case—was not an issue in the first interview, which occurred after Syvertson's arrest on unrelated charges.

[¶ 45] Dale V. Sandstrom

---

6. Syvertson moved this Court to accept and consider his "Reply Brief to the Appellee's Response to the Appellant's Supplemental Brief." Syvertson's "Reply Brief" is not permitted by the Rules of Appellate Procedure. *See* N.D.R.App.P. 28(c) and 31(a). We deny Syvertson's motion.